**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | |
|---|---|
| Deanna Brown-Thomas, *an individual and in her capacity as intestate heir and pending Personal Representative of the estate of her sister, the deceased Venisha Brown*; Yamma Brown, *an individual*; Michael D. Brown, *an individual*; Nicole C. Brown, *an individual*; Jeanette Mitchell Bellinger, *an individual*; Sarah LaTonya Fegan, *an individual*; Ciara Pettit, *an individual*; and Cherquarius Williams, *an individual*, <br><br> Plaintiffs, <br><br> v. <br><br> Tommie Rae Hynie, *an individual also known as Tommie Rae Brown*; James J. Brown, II, *an individual*; Russell L. Bauknight, *as the Personal Representative of the Estate of James Brown and Trustee of the James Brown I Feel Good Trust*; David C. Sojourner, Jr., *as the Limited Special Administrator of the Estate of James Brown and Limited Special Trustee of the James Brown I Feel Good Trust*; and Does, *1 through 10, inclusive*, <br><br> Defendants. | Civil Action No.: 1:18-cv-02191-JMC <br><br> **ORDER AND OPINION** |

This matter is before the court upon Defendant ("Hynie"), Defendant James J. Brown, II

("Brown II"), Defendant Russell L. Bauknight ("Bauknight"), and Defendant David C. Sojourner

as the Limited Special Administrator's (the "LSA") (collectively, "Defendants") Motion to Revise

this court's August 21, 2019 ("August Order") and September 12, 2019 ("September Order")

Orders (collectively, "the Orders") (ECF No. 213). In the Orders, the court denied Defendants'

Motions to Dismiss based on rules and doctrines the court found inapplicable (ECF Nos. 80, 81,

85, 101). Due to the present procedural posture of the case, Defendants now bring their Motion to Revise pursuant to Federal Rule of Civil Procedure 54(b).

On December 4, 2019, Plaintiffs Deanna Brown-Thomas, Yamma Brown, Michael D. Brown, Nicole C. Brown, Jeanette Mitchell Bellinger, Sarah LaTonya Fegan, Ciara Petit, and Cherquarius William's (collectively, "Plaintiffs") filed their Response (ECF No. 215) to Defendants' Motion to Revise, which vigorously opposes the Motion.

The court also considers the LSA's Supplemental Memorandum supporting its Motion to Dismiss ("Supplemental Motion to Dismiss) (ECF No. 194)[1], wherein it argues that the court should grant its Motion to Dismiss (ECF No. 85) because the LSA is an improper party. Plaintiffs filed their Response (ECF No. 209) to this Motion on October 25, 2019. On November 1, 2019, the LSA filed a Reply to Plaintiffs' Response. (ECF No. 210).

Upon review of all parties' briefs, the applicable law, and for the reasons set forth herein, the court **DENIES** Defendants' Motion to Revise (ECF No. 213) and **DENIES** the LSA's Supplemental Motion to Dismiss (ECF No. 194).

---

[1] On June 19, 2019, this court held a hearing regarding Defendants' Motions to Dismiss, including the LSA's Motion to Dismiss, wherein the LSA argued that Plaintiffs' allegations as to the LSA are insufficient to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6). Specifically, the LSA argued that it is an improper party because its limited duties "to defend the Estate and Trust against Will and Trust Challenges" legally preclude it from entering into secret agreements mentioned in the Complaint. (ECF No. 210 at 12.) In other words, the LSA states that it "lacks the legal authority to enter into contracts that violate the Copyright Act on behalf of the Estate/Trust…" (ECF No. 194 at 12.) However, the LSA, while briefly mentioning his limited scope, had not briefed the issue. Therefore, the court requested the LSA to "fully brief" arguments as to why dismissal is required under an "improper party" theory. (ECF No. 186.) On September 27, 2019, the LSA complied with the court's request and filed a Supplemental Memorandum supporting its Supplemental Motion to Dismiss as an Improper Party (ECF No. 194).

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case befalls against the backdrop of a long-standing personal and legal battle between several entities (a) Plaintiffs—the adult children to the late African-American singer, James Brown ("Brown")—,(b) Hynie—Brown's second wife and surviving spouse, (c) Brown II— Brown's son from his second marriage with Hynie and (d) Bauknight and the LSA—Fiduciaries of the James Brown Estate and Trust. The parties are undoubtedly plagued by a panoply of issues, some of which are irrelevant to this matter, stemming from the years-long battle. The crux of this matter surrounds a clash between the parties regarding the Copyright Act's Termination Provisions, 17 U.S.C. §§ 304(c), 203(a), ("Termination Provisions"), which gives Plaintiffs—as Brown's statutory heirs, Hynie—as Brown's, as of now, legally declared [2] statutory spouse, and Brown II—as Brown's son, shared federal "termination" interests to recapture the rights to hundreds of Brown's musical compositions. The termination provisions were created to enable artists to renegotiate the terms of the publishing deals they concluded before the true value of their work was known. If, as in the present case, the artist is deceased, then his or her statutory heirs and surviving spouse inherit and are permitted to exercise those termination rights. 17 U.S.C. §§ 304(c)(5).

---

[2] In 2015, the Aiken County Court of Common Pleas determined that Defendant Hynie was the surviving spouse of James Brown. (ECF No. 80-1 at 6.) During 2015, the same court held that Defendant Brown II was the biological son and a lawful heir to James Brown. (ECF No. 101-4.) In 2018, the South Carolina Court of Appeals also held that Defendant Hynie was the surviving spouse of James Brown. *See In re Estate of Brown*, 818 S.E.2d 770, 776 (S.C. Ct. App. 2018) ("Therefore, we find the trial court did not err in finding [Defendant Hynie] was married to Brown.") Currently, Plaintiffs have appealed the spousal status of Defendant Hynie to the South Carolina Supreme Court (ECF No. 151 at 4).

Plaintiffs allege, *inter alia*, that Hynie, Brown II, Bauknight, and the LSA have entered into various agreements with **one another** and that Hynie and Brown II have entered agreements with third parties, which contain terms—both known and allegedly concealed—intended to deprive Plaintiffs of their inalienable termination rights in violation of the Copyright Act. Specifically, Plaintiffs allege that the agreements provide Hynie control over Brown's compositions—to the exclusion of Plaintiffs.

Moreover, Plaintiffs plead that such agreements are "void under Sections 304(c)'s and 203's protective provisions which safeguard Plaintiffs' termination rights "[n]otwithstanding any agreement to the contrary" and which also place strict time limits on when a statutory heir may assign or encumber his or her termination interests." (ECF No. 1 at ¶¶ 68, 73-77); 17 U.S.C. §§ 304(c)(5), 304(c)(6)(D), 203(a)(5), 203(b)(2)-(4).

*James Brown's Death and Probate Issues*

Brown died on December 25, 2006, and left a will, disposing of his personal assets, and a trust, disposing of his music, commercial, and real estate assets. (ECF No. 1 at ¶ 41.) In January of 2007, Brown's will was submitted for informal probate in the probate court in Aiken County, South Carolina. (*Id.* ¶ 42.) Neither Hynie, nor Brown II, were named as beneficiaries of the will or trust. (*Id.* ¶ 43.) In 2007, Hynie and Brown II brought challenges to Brown's will and trust. (*Id.* at 11 ¶ 42.) Hynie filed for her spousal rights in South Carolina, which would have entitled her to a statutory elective share and a one-half omitted spouse's share, while Brown II asserted his right to a state statutory child share as a lawful heir. (ECF No. 80-1 at 3.) Plaintiffs, as Brown's adult children, also brought challenges to set aside his will. *See Wilson v. Dallas*, 743 S.E.2d 746, 750–51 (S.C. 2013);(*See also* ECF No. 80-1 at 3; ECF No. 80-2 at 29.) As a result of these

collective challenges, Brown's will was submitted to the Probate Court of Aiken County, South Carolina. (ECF No. 1 at 11 ¶ 42.) Eventually, the Probate Court of Aiken County transferred the administration of James Brown's estate to the Aiken County Court of Common Pleas. (ECF No. 1 at 11 ¶ 43; ECF No. 80-1 at 4.)

*The Agreement Concerning the LSA*

Around November 2015, the South Carolina trial court determined that Hynie was the surviving spouse of Brown. (ECF No. 80-1 at 6.). The LSA and Plaintiffs appealed the spousal order in the South Carolina Court of Appeals. (*Id.*) On March 8, 2017, however, the LSA along with Bauknight, entered into a written settlement agreement with Hynie (the "LSA-Bauknight-Hynie Settlement Agreement" or "LBH Settlement Agreement"). (*Id.*) Under the LBH Settlement Agreement, Hynie agreed to dismiss her claims against the Estate, and the LSA agreed to withdraw its appeal of the spousal order. (ECF No. 194-2.)

Moreover, and of relevance to Plaintiffs' allegations, the LBH Settlement Agreement required Hynie to "transfer sixty-five percent of proceeds from her copyright termination rights to the Trust." (ECF No. 194-2 at 2.)[3] The LBH Settlement Agreement also states that, "the value of the federal termination rights could be worth tens of millions of dollars, a substantial portion of which will inure to the benefit of the Charitable Trust assuming [Hynie] is the surviving spouse." (*Id.*) Plaintiffs, skeptical of the LBH Settlement Agreement, first allege that there is good reason[4]

---

[3] In moving to dismiss Hynie's claims and the LSA's appeal, the parties attached a copy of the settlement agreement to their motion papers. (*Id.* ¶ 45) (ECF No. 194-2.)

[4] According to Plaintiffs' Complaint, in 2013, prior to any decision in the South Carolina Court of Common Pleas, Hynie, on behalf of herself and her son, Brown II, exercised Brown's termination rights to approximately 138 compositions. (ECF No. 1, ¶ 50.) She served notices of termination on Warner Chappell Music, Inc. ("WCM"), the successor music-publisher to the original grantees of the compositions. (*Id.*). Plaintiffs allege that Peter Afterman, the Estate's music consultant, assisted Hynie with her notices of termination, intimating a possible conflict of interest and collusion between Defendant Hynie, Bauknight, and the LSA. (*Id.*) Hynie did not disclose the 2013

to believe that the LBH Settlement Agreement contains *undisclosed terms*, which have not been disclosed to Plaintiffs or this court. In June 2017, Plaintiffs filed a Motion to Compel the LSA and Bauknight to disclose the *complete* terms of all agreements between Hynie, the LSA, and Bauknight in the South Carolina trial court. (*Id.* ¶ 46). At an October 31, 2017 hearing of Plaintiffs' Motion to Compel disclosure, Plaintiffs allege that the LSA and Bauknight indicated that undisclosed terms existed. (*Id.*) The South Carolina trial court eventually denied Plaintiffs' Motion to Compel disclosure. (*Id.*) Whether the LBH Settlement Agreement along with any potentially undisclosed terms violate the Copyright Act's termination provisions are at the core of Plaintiffs' allegations against Hynie *and the LSA.*

Plaintiffs seek a declaratory judgment under the Copyright Act, 17 U.S.C. §§ 101 *et seq*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring the agreement(s) between Defendants, or the terms thereof, to be in violation of the Act's termination provisions and the federal principles and objectives guiding their enactment.

### The August and September Orders

On August 21, 2019, after a June hearing, this court issued a fifty-seven (57) page Order discussing the applicable law and reasons for the denial of Defendants' Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(5). *See Brown-Thomas v. Hynie*, C/A No.

---

notices of termination to Plaintiffs and did not publicly record the notices of termination with the Copyright Office until 2015. (*Id.* ¶ 51.) Moreover, "unbeknownst to Plaintiffs, around August 1, 2015, Defendants Hynie and James J. Brown II entered into an agreement to transfer five of the recaptured compositions for $1,875,000 back to WCM (the "WCM Agreement")." (*Id.* ¶ 52.) Plaintiffs allege that a music industry consultant, working on behalf of the Estate, participated in the negotiation of the WCM Agreement. (*Id.*) Plaintiffs allege that by leaving intact the Estate's approximately fifty-percent royalty interest in the compositions, the WCM Agreement demonstrated the undisclosed involvement of the LSA and Bauknight in the transaction. (*Id.*) Those agreements are not the agreements central to this matter. However, the court observes that Plaintiffs refer to the WCM agreement in their Complaint to provide context to their claims.

1:18-cv-02191-JMC, 2019 WL 1043724, at *1 (D.S.C. August 21, 2019); *see also* ECF No. 183.)

On September 12, 2019, the court issued its eighteen (18) page Order denying Defendants'

Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 185.), including the LSA's

Motion to Dismiss (ECF No. 85). On September 27, 2019, with leave of the court, the LSA

separately filed its own Supplemental Motion to Dismiss (ECF No. 194). On November 25, 2019,

nearly *three months* after this court's Orders, Defendants filed, under Rule 54(b), their Motion to

Revise the court's August and September Orders. (ECF No. 213.) Both Motions are ripe for

disposition.

## II. LEGAL STANDARD

*Federal Rule of Civil Procedure 54(b) Motion for Reconsideration*

The Federal Rules of Civil Procedure provide the following:

> [A]ny order or other decision, however designated, that adjudicates fewer than all
> the claims or the rights and liabilities of fewer than all the parties does not end the
> action as to any of the claims or parties and *may be revised at any time before the
> entry of a judgment* adjudicating all the claims and all the parties' rights and
> liabilities.

Fed. R. Civ. P. 54(b) (emphasis added). A federal district court "retains the power to

reconsider and modify its interlocutory judgments, including partial summary judgments, at any

time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*,

326 F.3d 505, 514–15 (4th Cir. 2003). "Compared to motions to reconsider *final* judgments

pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves

broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops.

Despite the inherent flexibility embodied within Rule 54(b), the United States Court of Appeals

for the Fourth Circuit has mindfully cautioned that "the discretion afforded by Rule 54(b) 'is not

limitless,' . . . ." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 256 (4th

Cir. 2018) (quoting *Carlson*, 856 F.3d 320 at 325). Specifically, the Fourth Circuit has

7

emphasized that a federal district court's revision pursuant to Rule 54(b) is "*cabined . . . by treating interlocutory rulings as law of the case.*" *Carlson*, 856 F.3d at 325 (emphasis added) (citations omitted). Although Rule 54(b) provides a federal district court with discretion to revisit an earlier ruling, "such discretion is 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, *nor without good reason permitted*, to battle for it again.'" *U.S. Tobacco Coop. Inc.*, 899 F.3d at 257 (emphasis added) (quoting *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)).

Accordingly, as explicitly mandated by the Fourth Circuit, "a court *may revise* an interlocutory order under the same circumstances in which it may depart from the law of the case: '(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice.'" *Id.* (emphasis added) (quoting *Carlson*, 856 F.3d at 325). While this standard resembles the standard under Rule 59(e), it accounts for "*potentially different evidence discovered during litigation* as opposed to the discovery of 'new evidence not available at trial.'" *Carlson*, 856 F.3d at 325 (emphasis added) (quoting *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)).

*The Copyright Act's Termination Provisions*

The Copyright Act's termination provisions in §§ 203(a)(5) and 304(c)(5) "allow[ ] an author, if he is living, or his widow and children, if he is not, to recapture ... the rights that had previously been transferred to third parties." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008). "Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant." 17 U.S.C. § 203(a)(3). This termination right is inalienable because, under the statute, "[t]ermination of the

grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." *Id*. (citing § 304(c)(5)).

If an author is survived by a spouse and children, the surviving spouse is deemed to own fifty-percent of the termination interest, and the author's surviving children, and the grandchildren of any deceased child, own collectively the other fifty-percent of the termination interest on a *per stirpes* basis. A previous spouse is not entitled to termination interests. The termination right can only be exercised by those persons that collectively own more than one-half of the termination interest. §§ 304(c)(2)(A)-(C), 203(a)(2)(A)-(C). Statutory heirs co-own the copyright interests in a work recaptured via statutory termination in the same proportion as their share of the termination interests. These co-ownership interests vest upon the service of the applicable notice of termination. §§ 304(c)(6)(B), 203(b)(2).

### III. DISUCSSION

A. <u>The Parties' Arguments Regarding Defendants' Motion to Revise under Rule 54(b)</u>

The court first addresses Defendants' Motion to Revise under Fed. R. Civ. P. 54(b) (ECF No. 213). The Motion raises three arguments: (1) the court does not have subject matter jurisdiction over the entire case, (2) the court erred in holding that Plaintiffs have standing, and (3) Plaintiffs' claims are not ripe. As such, the court will limit its analysis to the pertinent arguments therein.

Expanding these grounds, Defendants claim that "this Court's recognition of an implied right of action for Plaintiffs' first claim is unquestionably prohibited by modern Supreme Court and Fourth Circuit authority" (ECF No. 213 at 20.), and that the court "failed to apply the current applicable United States Supreme Court standard for determining whether the Copyright Act afforded Plaintiffs a private right of action." (ECF No. 213 at 3.)

Plaintiffs assert that Defendants' Motion is procedurally and substantively deficient as the Motion is untimely and only aims to impermissibly relitigate issues previously contemplated by the court. (ECF No. 215 at 1-10.)

B.    The Court's Review of Defendants' Rule 54(b) Motion

As stated above, in order for the court to revise its August and September Orders, clear precedent mandates that Defendants must show one of the following: "(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *U.S. Tobacco Coop. Inc.*, 899 F.3d at 257 (quoting *Carlson*, 856 F.3d at 325). Defendants do not maintain that there is "*potentially different evidence discovered during litigation*" within their Motion. Secondly, at no point do Defendants ever suggest that there is "a change in applicable law" or an alteration to the legal principles which guided the court's August or September Orders. Finally, despite Defendants' unpersuasive arguments, the court has committed no clear error causing manifest injustice.

*Subject Matter Jurisdiction*

In Defendants' view, the court apparently "presumed a facial attack on subject matter jurisdiction" when it determined:

> The plain language of Plaintiffs' Complaint contends that Defendants' "improper Agreements" violate 17 U.S.C. 203(a)(5) and 304(c)(5) because they are "agreement[s] to the contrary" that "encumber [ ] termination rights." (ECF No. 1 at 20 ¶ 73.) **Plaintiffs' claims necessarily require a federal court to determine how and why Defendants' alleged agreements are unlawful "agreements to the contrary" that are void under the express provisions of the Copyright Act. *See* 17 U.S.C. §§ 203(a)(5), 304(c)(5).**

(ECF Nos. 213 at 2; 183 at 35.) (Emphasis added.)

Defendants would have this court to ignore the *specific* standard set forth by Judge Friendly in *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 828 (2d Cir.1964), which was explicitly adopted by the

Fourth Circuit in *Arthur Young Co. v. City of Richmond*, 895 F.2d 967, 969 (4th Cir. 1990) and consistently applied in virtually all circuits to determine whether subject matter jurisdiction 'arises under' the Copyright Act. The court declines to do so. While the court understands that the well-established standard set forth in *T.B. Harms* may not be particularly advantageous to Defendants, it is, indeed, the correct standard to apply and was, in fact, the standard the court followed in its Orders. As Plaintiffs astutely observe, "under this well-settled test, a federal court has subject matter jurisdiction if *any one* of three conditions exists: the complaint (1) "is for a remedy expressly granted by the Act," (2) "asserts a claim requiring construction of the Act," or (3) "presents a case where a distinctive policy of the Act requires that federal principles control disposition of the claim." *Arthur Young & Co.*, 895 F.2d at 969-970 (quoting *T.B. Harms Co.*, 339 F.2d at 828). "If any one ground is satisfied, the federal courts have jurisdiction." *Vestron, Inc. v. Home Box Office, Inc.*, 839 F.2d 1380, 1381 (9th Cir. 1988)." (ECF No. 215 at 12.).

Defendants assert that "The United States Supreme Court has greatly narrowed the second prong of the *T.B. Harms* test since 1964." (ECF No. 213 at 3.) Interestingly, Defendants present no Supreme Court case that narrows the second prong of the *T.B. Harms* test—which, as a reminder, states that jurisdiction is conferred if a "**Plaintiff asserts a claim requiring construction of the Act.**" (Emphasis added). Defendants also fail to present any Supreme Court jurisprudence that overturns *T.B. Harms*. Instead, Defendants represent that the 1979 United States Supreme Court case, *Touche Ross v. Reddington*, 442 U.S. 560 (1979), is somehow the new and improved standard or "present application" of the second prong of the *T.B. Harms* test. (ECF No. 213 at 4.) The court rejects this reading of *Touche* and observes that *Touche* is not a case that mentions—explicitly or implicitly—the *T.B. Harms* test nor touches on the issues of Copyright

law enveloped in this matter.[5]

In its Orders, the court, like others courts,[6] applied the test articulated in *T.B. Harms* and found that "Plaintiffs' claims necessarily require a federal court to determine how and why Defendants' alleged agreements are unlawful agreements "to the contrary" and which, if any, should be declared as "void under the express provisions under the Copyright Act." (ECF No. 183.) This court would not be the first to determine whether declaratory relief is warranted under the Copyright Act's Termination Provisions. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 979, 986 (9th Cir. 2008) (action for declaratory relief, holding that pre-assignment of copyright termination interests violated § 304(c)); *see also Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1114 (9th Cir. 2015).

More importantly, federal courts have determined whether an agreement was "to the contrary" such that it violated the Copyright Act's termination provisions and that investigation has conferred subject matter jurisdiction upon those courts. The issue before the Second Circuit in

---

[5]*Touche* concerned whether a federal cause of action can be inferred under the Securities Exchange Act and the Supreme Court, in holding that the Securities Exchange Act did not imply such a cause of action, emphasized that the statute did "not, by its terms, purport to create a private cause of action in favor of *anyone*." *Touche Ross Co.*, 442 U.S. at 569 (emphasis added). The *Touche* Court emphasized that the Securities Exchange Act "neither conferred rights on private parties nor proscribed any conduct as unlawful." *Id.*

[6] Indeed, courts, including the Fourth Circuit, have evaluated whether a claim arises under the Copyright Act specifically by applying the *T.B. Harms* test, which assesses whether the complaint (1) is for a remedy expressly granted by the Copyright Act, i.e., infringement, (2) asserts a claim that requires construction of the Copyright Act, or (3) involves a distinctive policy of the Copyright Act that requires that federal principles control the case. *Arthur Young & Co.,* 895 F.2d at 970. *Andrews v. Daughtry*, No. 1:12-CV-00441, 2013 WL 664564, at *5 (M.D.N.C. Feb. 22, 2013); *see also Xcel Data Sys., Inc. v. Best*, No. 1:08-CV00613OWWGSA, 2009 WL 902412, at *5 (E.D. Cal. Mar. 31, 2009) ("Under the Harms test, an action 'arises under' the Copyright Act "if and only if" (1) the complaint seeks a remedy expressly granted by the Copyright Act; (2) the complaint requires interpretation of the Copyright Act; or (3) federal principles should control the claims.")

*Marvel Characters, Inc. v. Simon* is precisely on point:

> **This appeal requires us to examine the scope of the termination provision of the Copyright Act of 1976 (the "1976 Act"), 17 U.S.C. § 304(c).** Section 304(c) grants authors (or if deceased, their statutory heirs) an inalienable right to terminate a grant in a copyright fifty-six years after the original grant "**notwithstanding any agreement to the contrary**." 17 U.S.C. § 304(c)(3),(5). The termination provision, however, has one salient exception: copyright grants in works created for hire cannot be terminated. 17 U.S.C. § 304(c).

310 F.3d 280, 290-91 (2d Cir. 2002) (emphasis added).

To further drill the subject matter issue, the Second Circuit in *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008), was tasked with determining "whether [an agreement] [was] an 'agreement to the contrary'" under 17 U.S.C. § 304(c)(5).[7] There, John Steinbeck, the famous novelist, entered into a publishing agreement with the predecessor of his original publishing company. The agreement covered many of his early works, including the iconic "Of Mice and Men" and "The Grapes of Wrath". When Steinbeck died in 1968, he left his copyrights in the early works to his widow Elaine. In 1994, Elaine Steinbeck and the company entered into a new publishing agreement for the early works, which by its terms 'canceled and superseded' all prior agreements, and provided Elaine with substantially improved economic benefits and additional control over the use of the works. Steinbeck's sons from a previous marriage later challenged the validity of the 1994 Agreement because they argued that the Agreement had the effect of disinheriting the statutory heirs to the termination interest and, therefore, must be set aside as contrary to the very purpose of the termination statute. Defendants cite *Penguin* for the proposition that "majority holders of termination rights can decide not to exercise their interests" (ECF No. 213 at 15.) Defendants lead the court to the following excerpt:

> If the holders of a majority of an author's termination interest were to agree that they would not exercise their termination rights, this would have the effect of

---

[7] Section three of the *Penguin* opinion was literally titled "Whether the 1994 Agreement is an 'Agreement to the Contrary' under 17 U.S.C. § 304(c)(5)." *Penguin* 537 F.3d at 199.

eliminating a termination right as to the minority termination interests. Yet such an agreement could not be held ineffective as an 'agreement to the contrary' inasmuch as section 304 itself contemplates elimination of termination rights in that manner.

*Penguin* 537 F.3d at 202.

Because the *Penguin* Court did not decide issues present in this case (alleged side agreements, etc.) and because *Penguin*, like all of the cited cases, was decided on summary judgment where discovery had ensued and where the court had an opportunity to examine the agreements at issue, this portion of *Penguin* is not helpful to Defendants' argument. The main dispute here is whether a federal court has jurisdiction to decide the very question that was presented in *Penguin*: whether an agreement constitutes an "agreement to the contrary" under the termination provisions. A federal court does have jurisdiction to determine that question.

The court finally observes that federal courts have also determined whether a work of art constituted a "work for hire". *See Pastime LLC v. Schreiber*, No. 16-8706, 2017 US Dist. LEXIS 199943 (S.D.N.Y. Dec. 5, 2017) (District court denied defendant's motion to dismiss plaintiffs' claim for declaratory judgment action for lack of subject matter jurisdiction because the claim turned on whether defendant's revision of a book constituted "work for hire" and the allegations required interpretation of the Copyright Act's provisions). The court discerns no legally significant difference for purposes of subject matter jurisdiction in the present case.

To bookend, Defendants assert that the court did not consider whether Congress intended for a private right of action to exist under the termination provisions. To the contrary, the court went into detail within the section of the Orders titled "Relevant Statutory Provisions", whereby the court discussed the purpose and intent of Congress in enacting the provisions at issue:

Congress enacted these statutory provisions to address "the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited," and safeguard authors from the "unremunerative transfers" of copyright grants. H.R. REP. NO. 94-1476, at 124 (1976). *See also*

> *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73 (1985) ("[T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product.

(ECF No. 183 at 5.)

Additionally, the court now highlights the House Report's note stating that "although affirmative action is needed to effect a termination, the right to take this action ***cannot be waived in advance or contracted away***"—thereby mirroring Plaintiffs allegations against Hynie. H.R. REP.NO. 94-1476, at 125 (1976). As to the special nature of these provisions, the United States Supreme Court has noted that the Copyright Act of 1976 "provides an inalienable termination right" for both authors and his or her statutory heirs. *Stewart v. Abend*, 495 U.S. 207, 230 (1990) (citing 17 U.S.C. §§ 203, 304).

Of note, sections 203 and 304(c) do not mention who may challenge the existence of "an agreement to the contrary" that impacts termination rights or the validity of termination notices. *See* 17 U.S.C. §§ 203, 304(c); *see also Ray Charles,* 795 F.3d at 1113 ("Both § 203 and § 304(c) are silent on who may challenge the validity of termination notices."). The court correctly applied the applicable standard in *T.B. Harms*, which is the authoritative case controlling interpretation of section 1338(a) and thus used to determine whether federal subject matter jurisdiction exists under the Copyright Act.[8]

### Standing and Ripeness

Defendants re-assert that Plaintiffs lack standing to bring this suit and attack the court's determination regarding injury and ripeness. Specifically, Defendants state that "no such injury

---

[8] *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679 (2d Cir. 1993) (describing *T.B. Harms* Test as "an explicitly tentative formulation that has nevertheless become authoritative.").

can occur unless and until (1) Mrs. Brown is determined to be the surviving spouse by the South Carolina Supreme Court; (2) Mrs. Brown survives until 2021; *and* (3) each Plaintiff survives until 2021 (because the next copyright ripe for termination arises in 2021)." (*See* ECF No. 213 at 27.) However, as Defendants are well aware, they have already argued the same points in various past-denied motions, wherein the court noted:

> Even though Defendant Hynie's spousal status is pending for review before the South Carolina Supreme Court, any determination about her marital status to James Brown will only impact what her termination interest is or is not, in relation to his other statutory heirs, under the Copyright Act's provisions. *See* 17 U.S.C. §§ 203(a)(1)(2), 304(c)(2). The South Carolina Supreme Court's decision will not impact or have any bearing about whether she or other Defendants *currently engaged* in a prohibited "agreement to the contrary" in violation of 17 U.S.C. §§ 203(a)(1)(2) and 304(c)(2), or if she or other Defendants *currently ignored* any of the Copyright Act's procedural delineations for the exercise of termination rights, the two principal allegations brought by Plaintiffs' Complaint. (*See* ECF No. 1 at 18–22 ¶¶ 66–77.)

 (*See* ECF Nos. 80, 81, 85, 101.)

Defendants cannot now use Rule 54(b) to re-argue points which have previously failed. *See generally U.S. Home Corp. v. Settler Crossing, LLC*, C/A No. DKC 08–1863, 2012 WL 5193835, at *3 (D. Md. Oct. 18, 2012) ("A motion for reconsideration under Rule 54(b) may not be used to merely reiterate arguments previously rejected by the court." (citation omitted)). Accordingly, the court finds that there is no clear error of law nor manifest injustice in its August or September Orders. *See* Fed. R. Civ. P. 54(b). Therefore, the court **DENIES** Defendants' Motion to Revise (ECF No. 213).

C.    The Parties' Arguments Regarding the LSA's Supplemental Memorandum

The LSA's main argument is that the court should dismiss the action as to it because copyright termination rights are outside of the course and scope of its fiduciary duties and authority and it "has never possessed the legal capacity or authority to enter into the purported 'secret' agreements, which Plaintiffs allege are unlawful under the Copyright Act." (ECF No. 194 at 1.) In

support of its assertion, the LSA cites the state court's Appointment Order as proof of its limited role:

> The Appointment Order defines "Will and Trust Challenges"—those exclusively within the scope of the LSA's fiduciary duties—as including only: (i) "the ongoing spousal elective share matter" filed by Tommie Rae Brown on February 1, 2007; (ii) "the omitted spouse matter" filed by Tommie Rae Brown on February 1, 2007; (iii) "the omitted child matter" filed by James Brown II on July 5, 2007; and (iv) "the legal challenges to the validity of the will and trust," including the petitions to set aside informal probate and trust filed by Daryl Brown, Vanisha Brown, Larry Brown, Deanna Brown Thomas, Yamma Brown, and Tonya Brown on December 26, 2007, and by Tommie Rae Brown on December 19, 2007.

(ECF No. 85-1.)[9]

The LSA contends that "the only specific allegations in the Complaint as to the LSA are mere references to [its] involvement in the South Carolina Probate Court." (ECF No. 209 at 5.) The LSA further asserts that Plaintiffs' allegations are mere speculation. (ECF No. 209 at 6.)

---

[9] On October 1, 2013, the South Carolina Court of Common Pleas, Aiken County, issued an order (the "Appointment Order") appointing Russell L. Bauknight to serve as Trustee of the Trust and Personal Representative of the Estate (hereinafter, in both capacities, the "Personal Representative"). (See ECF No. 1); (*see also* ECF No. 85-1 at 3, ¶ 5). In the Appointment Order, the Court appointed Sojourner to serve as the Limited Special Administrator of the Estate and Limited Special Trustee of the Trust. (ECF No. 1at 20, ¶ 26.) The Appointment Order assigned the following responsibilities, duties, and rights to the Personal Representative and the LSA (Bauknight and Sojourner), respectively:

> 5. Russell L. Bauknight is hereby appointed as the Personal Representative of the Estate and Trustee of the Trust effective immediately, with full, absolute and exclusive authority to carry out the Estate's administration and the Trust's administration, and all business and matters related thereto, and shall specifically have the authority and power to act on behalf of, and bind, the Estate and the Trust for all purposes, except as limited by the appointment of the Limited Special Trustee and Limited Special Administrator described below.

> 5. David C. Sojourner is appointed as Limited Special Trustee for the sole, exclusive, and specific purpose of defending the Trust in the Will and Trust Challenges, until final resolution thereof, and is authorized to retain Adams and Reese LLP to represent him in such matters.

On the other hand, Plaintiffs argue that "throughout the Complaint, the LSA is alleged to be a participant or contributor to the alleged wrongful conduct." (ECF No. 209 at 5.) For instance, Plaintiffs mention that the "LSA is a party to the disclosed LBH Settlement Agreement **which itself** is alleged to violate the Copyright Act" and is allegedly the "prerequisite for the other concealed agreement(s) (the "Concealed Terms") alleged in the Complaint." (*Id*.) (Emphasis added).

D.    The Court's Review Regarding the LSA's Supplemental Memorandum

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556, 127 S.Ct. 1955 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable ...."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks and citations omitted).

The court observes the following specific allegations against the LSA:

> Para. 26: "Plaintiffs are informed and believe and thereon allege that Defendant [Sojourner] is the Limited Special Administrator of the Estate, and the Limited Special Trustee of the Trust (hereinafter Mr. Sojourner is referred to in both capacities as the "LSA"), appointed in October 2013 to defend the Estate and Trust against numerous claims by [Tommie Rae Brown][.]"

> Para. 44: "In or about November 2015, the LSA, on behalf of the Estate and Trust, vigorously appealed the Spousal Orders to the South Carolina Supreme Court of Appeals, and demonstrated in subsequent appellate briefing why the Spousal Orders had no basis in fact or law. While that appeal was pending, however, the Estate and Trust Fiduciaries suddenly reversed course, and on March 8, 2017, entered into a written settlement agreement with [Tommie Rae Brown] (hereinafter, the "Purported Settlement Agreement"). Therein, [Tommie Rae Brown] agreed to dismiss her claims against the Estate and Trust, and the LSA agreed to withdraw its appeal of the Spousal Orders **in exchange for [Tommie Rae Brown]'s transfer to the Trust of sixty-five percent (65%) of all proceeds from her copyright termination rights**."

> Para. 45: "In moving to dismiss [Tommie Rae Brown's] claims and the LSA's appeal, [Tommie Rae Brown] and **the LSA attached a copy of the Purported Settlement Agreement to their motion papers. However, the terms of the Purported Settlement Agreement were facially-implausible and [Tommie Rae Brown's] paltry consideration for the agreement strongly suggested that there was much more to Defendants' bargain.** Accordingly, Plaintiffs . . . who were named as beneficiaries in Brown's Will, repeatedly requested that the Estate and Trust Fiduciaries disclose any undisclosed terms and agreements with [Tommie Rae Brown], but their requests for transparency were ignored."

> Para. 46: "**In June 2017, these Plaintiffs moved in the South Carolina trial court for an order compelling the Estate and Trust Fiduciaries to disclose the complete terms of all agreements between [Tommie Rae Brown] and the Estate and Trust Fiduciaries. Both [Tommie Rae Brown] and the Estate and Trust Fiduciaries vigorously opposed this motion, arguing they had no duty to disclose their terms**, leading to the inescapable conclusion that, while purporting to disclose all terms in the Purported Settlement Agreement, they had, in fact, concealed numerous terms in a parallel document(s) (hereinafter, the "Concealed Terms"), perpetuating a fraud on both Plaintiffs and the court. Indeed, at an October 31, 2017 hearing of Plaintiffs' motion to compel disclosure, the Estate and Trust Fiduciaries indicated that there were undisclosed terms. Notwithstanding all of the above, the South Carolina trial court once again

> sided with [Tommie Rae Brown], and curiously denied Plaintiffs' motion
> to compel disclosure, without analysis or any explanation."

(ECF No. 1.) (Emphasis added).

The court is unpersuaded by the LSA's argument that it cannot potentially be held liable for any of Plaintiffs' claims solely on the basis that it "lacks the legal authority to enter into contracts that violate the Copyright Act" and that the LSA is "legally incapable of 'conspiring with' the other defendants to usurp Plaintiffs' rights and interests under the Copyright Act." The Complaint plainly alleges that the LSA "was a party and signatory to the Purported Settlement Agreement [LBH Settlement Agreement] which itself is alleged in the Complaint to violate the Copyright Act." (ECF No. 194 at 15.) The LSA attached the "Order Authorizing Settlement", which also clearly states that "the Appointment Order does not expressly list a power to settle claims; however, the Court finds **such power is inherent in both the Appointment Order and the applicable legal authority.**" (ECF No. 194-1 at 2.) Moreover, the state court found that "Bauknight **AND [the LSA] are duly authorized to enter into Settlement Agreements and …[the LSA] [is] empowered to bind the Estate and Trust…so long as the fiduciary determines such agreements to be appropriate in the best interest of the Estate and Trust**." (*Id.*)[10]

The LSA is hard-pressed to, in the first instance, argue that it has authority to enter and

---

[10]Generally, under the Federal Rules of Evidence, a federal court "may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508–09 (4th Cir. 2015) (citations omitted). *See generally Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record." (citation omitted)); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that '[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.'" (citation omitted)).

bind the Estate when the ends are beneficial, then distance itself from the same authority when it is not beneficial. The Appointment Order and the Settlement Order both establish that the LSA has enormous discretion to enter and bind the Estate into agreements that it determines "is in the best interest of the Estate", whether those agreements violate the Copyright Act is up to this court, not Defendants, to determine.

The court requires more factual development to determine whether the agreements at issue constitute "Agreements to the Contrary" under the Copyright Act. At this stage of the litigation, and considering all facts in the light most favorable to Plaintiffs, the court **FINDS** that Plaintiffs have sufficiently alleged that the LSA, along with the other defendants, have entered into classic "agreement[s] to the contrary", namely Defendants' 2017 [LBH] Settlement Agreement and undisclosed side-agreement(s) (the "Concealed Terms"), that purport to pre-assign or otherwise pre-encumber the statutory termination interests in the Compositions in violation of the Copyright Act. Accordingly, the court **DENIES** the LSA's Rule 12(b)(6) motion (ECF No. 85) and **DENIES** its Supplemental Motion (ECF No. 194).

### IV. CONCLUSION

After careful consideration of Defendants' Motion to Revise (ECF No. 213) and the LSA's Supplemental Motion to Dismiss (ECF No. 194), the court **DENIES** Defendants' Motion to Revise (ECF No. 213) and **DENIES** the LSA's Supplemental Motion to Dismiss (ECF No. 194).

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

February 20, 2020
Columbia, South Carolina